UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

David L. Backes and Sara L. Backes,           )
                              Plaintiffs      )
                                              )
        v.                                    )           Case No. 07-1283
                                              )
Village of Peoria Heights, Dustin Sutton,     )
William H. Switzer, and Kevin Hale,           )
                              Defendants      )

## ORDER AND OPINION

The parties have consented to have this case heard to judgment by a United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before

the court are two motions for summary judgment, one by Kevin Hale (#30) and one by the Village

of Peoria Heights, Dustin Sutton and William H. Switzer (#28). The motions are fully briefed, and

I have carefully considered the arguments and evidence of the parties.

## HALE'S MOTION

In response to Hale's motion, the Plaintiffs stated that they were abandoning their claims

against him and conceding summary judgment in his favor. (See, Doc. #36). Accordingly, Hale's

Motion for Summary Judgment (#30) is GRANTED.

## MOTION BY VILLAGE OF PEORIA HEIGHTS,
## WILLIAM SWITZER AND DUSTIN SUTTON

### SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c)(2) of the Federal Rules of Civil Procedure,

1

summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See <u>Jay v. Intermet Wagner Inc.</u>, 233 F.3d 1014, 1016 (7th Cir.2000); <u>Cox v. Acme Health Serv.</u>, 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 922 (7th Cir.1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, <u>Erdman v. City of Ft. Atkinson</u>, 84 F.3d 960, 961 (7th Cir. 1996); <u>Vukadinovich v. Bd. of Sch. Trustees</u>, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); <u>Lohorn v. Michal</u>, 913 F.2d 327, 331 (7th Cir. 1990); <u>DeValk Lincoln-Mercury, Inc. V. Ford Motor Co.</u>, 811 F.2d 326, 329 (7th Cir. 1987); <u>Bartman v. Allis Chalmers Corp.</u>, 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970); <u>Trotter v. Anderson</u>, 417 F.2d 1191 (7th Cir. 1969); <u>Haefling v. United Parcel Serv., Inc.</u>, 169 F.3d 494, 497 (7th Cir.1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. <u>Piscione v. Ernst & Young, L.L.P.</u>, 171 F.3d 527, 532 (7th Cir.1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." <u>McDonald v. Village of Winnetka</u>, 371 F.3d 992, 1001 (7th

Cir. 2004). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., <u>Jordan v. Summers</u>, 205 F.3d 337, 342 (7th Cir.2000).

The parties must identify the evidence (i.e. those portions of the pleadings, depositions, answers to interrogatories, admissions, affidavits, and documents) that will facilitate the court's assessment. <u>Waldridge</u>, 24 F.3d at 922. Thus, as Fed.R.Civ.Proc. 56(e) makes clear, a party opposing summary judgment may not rely on the allegations of her pleadings. Rather:

> [T]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

See, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). See also, Local Rule CDIL 7.1(D).

Neither the moving party nor the responding party may simply rest on allegations; those allegations must be supported by significant probative evidence tending. <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968). See also <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)(when the moving party has met its burden, non-moving party must do more than show some "metaphysical doubt " as to material facts). A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Anderson</u>, 477 U.S. at 250.

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. <u>Hedberg v. Indiana Bell Tel. Co.</u>, 47 F.3d 928, 931 (7th Cir. 1995), citing <u>Anderson</u>, 477 U.S. at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that

party will bear the burden of proof at trial, then summary judgment is proper. <u>Celotex</u>, 477 U.S. at 322; <u>Waldridge</u>, 24 F.3d at 920.

<h2 align="center">STATEMENT OF UNDISPUTED FACTS</h2>

Dustin Sutton is the Chief of Police for the police department of the Village of Peoria Heights, a position he has held since 1999. William Switzer is and at all pertinent times was employed as a Sergeant with Village's police department.

David Backes, one of the Plaintiffs in this case, is a military veteran who was (and remains) employed as a correctional officer for the Illinois Department of Corrections. As part of his military service and his employment, David had been trained in the use of a significant number of different firearms. In 2006, he owned two shotguns, both of which were kept in a gun case at his home. David has been under treatment for post-traumatic stress disorder and depression since 1996 or 1997. He takes a number of medications, including several anti-depressants and a strong sleep medication which puts him into an extremely deep sleep for 4-5 hours.

David and his wife Sara, also a Plaintiff herein, were having financial and marital difficulties in October of 2006. On October 17, 2006, David, Sara and his mother-in-law discussed some of those problems. David became upset and left at about 4:30 p.m. He drove around Peoria until about 11:30 p.m., talking to Sara via cell phone more than 5 times. At one point, he told Sara he was going to take a bottle of his sleeping pills and kill himself.

David ended up stopped in a parking lot on Galena Road in Peoria Heights, looking toward the nursing facility where his mother resided. By then, he had decided not to commit suicide, although he had not told Sara about his change of heart. The lights were off in his mother's apartment unit, so he drove to the nearby Poplar Street Park in Peoria Heights. He took one of his

4

sleeping pills, planning to sleep for 4 or 5 hours in his car and then visit his mother when he awoke.

Meanwhile, Sara had called the East Peoria police department, reporting that her husband had threatened suicide. An East Peoria police officer was then dispatched to her house and was present during subsequent phone conversations between David and Sarah. Based on information gleaned from Sara's conversation with the officer, a report was released of a potential suicide. The report included a description of David, his clothing, and his car, as well as the facts that he had taken a number of anti-depressant medications and that he had those medications with him[1], and that he had talked to his wife but refused to tell her where he was. This report was released to ISPERN, LEADS and NCIC, all various forms of reporting information of interest to police officers. The latter two reports added that David had "access to weapons" and was "despondent over marital/finance probs."

Based on the cell phone conversations between Sara and David, the police were able to narrow down David's location. At 2:11 a.m. on October 18, Peoria Heights police officer Sergeant William Switzer (who is also a member of the Central Illinois Emergency Response Team or CIERT) located Backes' car, parked with its lights on at the Poplar Street Park. Switzer ran computer records for the license plate and received via the computer in his squad car the following information about David:

> TLH M06E1522 LEMEC.MISSNG/SUICIDAL EAST PEORIA.0029
> 101706.BACKES, DAVID L.M.W.
> ...
> MAY HAVE TAKEN 4 OR MORE ANTIDEPRESSANTS EMPLOYED AS CORRECTIONAL OFCR, HAS ACCESS TO WEAPONS, DESPONDENT OVER MARITAL/FINANCE PROBS LSW/JEAN JKT BLU SHIRT BLU JNS

---

[1] He apparently had an appointment at the VA Clinic earlier that day. His prescriptions had been changed or renewed, and he had filled those prescriptions, which is why he had them with him.

COWBOY BOOT.
... BLK.
00.PONT.GRA.4D.1G2WR5212YF104182
07.07.IL.MV.L13174...

Switzer moved his patrol car back away from David's car for safety reasons and notified

dispatch that he had located David's vehicle. Shortly thereafter, Kevin Hale (another Peoria Heights

police officer) and Paul Segroves (from the City of Peoria)[2] arrived on the scene. Switzer moved

close enough to David's car that he was able to see that there was someone in the car. Officer Hale

then positioned his police vehicle at an angle, about 3-4 car lengths away from the driver's side of

David's car, shining his high beam headlight and his spotlight at David's car. They could see the

occupant in the car, and they noticed that the front, driver's-side window was down.

At about 2:30 a.m., Switzer used the public address system in the police car to identify

himself and to request that David raise his hand to indicate he heard Switzer. This announcement

was made several times, with no response. On several occasions, Switzer could see some slight

movements - Switzer described them as a movement of the head or adjustment in the seat - but there

was nothing that Switzer interpreted as a response to his direction. Switzer's report shows that he

saw this type of movement at 3:24, 3:47, 3:58, 4:02, and 4:17.

At 2:49 a.m., Switzer sought confirmation whether David had weapons. Through dispatch,

East Peoria's police department was asked to talk to Sara about any possible weapons David might

have. An officer arrived at 2:52. Sara took him to the gun safe, and both of his weapons were there.

The officer reported to the East Peoria dispatcher that "unless he got something from somebody else,

there should not be any firearms or weapons in his vehicle." This information was conveyed by

---

[2]Plaintiffs have voluntarily dismissed their claims against Paul Segroves and the City of
Peoria. See Docs. #25 and #33.

telephone to the Peoria Police Department. It appears that Switzer, however, never received this information.

The situation as Switzer evaluated it was that David could be a danger to the officers on the scene. He based this conclusion on three factors: (1) not knowing whether David was armed; (2) the report that David was suicidal, which Switzer believed might mean that he was willing to harm not only himself but others; and (3) although David's movements showed that he was not unconscious, he failed or refused to respond or cooperate with officers at the scene.

Switzer contacted dispatch, relayed his view of the situation, and requested that Chief Sutton be alerted. He also requested that an ambulance respond and stand by in case David needed medical attention. Switzer then resumed his efforts to make contact with the occupant of the car. He obtained David's cell phone number and tried to call him, but the call went directly to voice mail. Switzer was not close enough to hear the phone ring, which would have told him whether David still had the phone with him.

Based on the information provided by Switzer, Chief Sutton believed that Backes could be a threat to himself, the officers and any residents in the area. He decided to notify the Central Illinois Emergency Response Team (CIERT) and request a CIERT supervisor at the scene. CIERT is a team consisting of members of various law enforcement agencies; the members are specially trained to handle various types of emergency situations.

Lt. Hartwig, who was a Peoria County Sheriff's deputy as well as a member of the CIERT team, arrived at about 4:30 a.m.. Switzer brought Hartwig up to speed. Chief Sutton then arrived at the scene, as did a CIERT supervisor, Lt. Pierson. Sutton was briefed by Switzer and Hale, while Pierson was briefed by Hartwig. Pierson then decided to call in the rest of the CIERT team.

Hartwig and Pierson formulated a tactical plan, which was carried out once the CIERT team arrived. The CIERT armored vehicle was moved between David's car and Switzer's patrol car. Spike strips were placed behind the back tires of David's car. Lt. Gaa, another CIERT member, deployed "pepper balls" into the open driver's side window while Switzer (who was also a CIERT team member) provided cover. CIERT team members then removed David from the car.

David suffered marks and bruising from the pepper balls. He was taken to Methodist Medical Center by the waiting ambulance. He alleges that his depression and PTSD worsened. One of his medications was altered, and this caused blood clots which resulted in hospitalization.

David and Sara filed this lawsuit. A number of their claims have previously been dismissed. The only remaining claims are the Fourth Amendment excessive force claim and the state law claims of common law battery, false arrest, and willful and wanton misconduct. Switzer argues that he is entitled to qualified immunity, because the use of force was reasonable and therefore constitutional, and because it violated no clearly established constitutional or statutory right. He also asserts that there is no evidence to support the state law claims and that, in any event, he is immune from those claims under the Illinois Local Government Tort Immunity Act.

**FOURTH AMENDMENT CLAIM**

*QUALIFIED IMMUNITY GENERALLY*

"The doctrine of qualified immunity shields from liability public officials who perform discretionary duties. <u>Belcher v. Norton</u>, 497 F.3d 742, 749 (7th Cir. 2007). Public officials, police officers among them, often are called upon to make difficult decisions in high pressure and high risk situations. Inevitably, some of those decisions will be mistaken. Subjecting police officers to liability for each reasonable but ultimately mistaken decision would result in "unwarranted timidity," would

deter talented candidates from becoming police officers and would result in lawsuits that distract officers from their duties. Malinowskiv. DeLuca, 177 F.3d 623, 626 (7th Cir. 1999) (citing Richardson v. McKnight, 521 U.S. 399, 409, 411 (1997)).

At the same time, there remains a "need to vindicate constitutional violations by government officials who abuse their offices." Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000). The doctrine of qualified immunity strikes a balance between these conflicting concerns: It shields from liability police officers "who act in ways they reasonably believe to be lawful." Anderson v. Creighton, 483 U.S. 635, 641 (1987). Qualified immunity provides "ample room for mistaken judgments," and it protects all but the "plainly incompetent or those who knowingly violate the law." Hunter v.Bryant, 502 U.S. 224, 227, 229 (1991) (quoting Malley v.Briggs, 475 U.S. 335, 343 (1986)). It protects public officials in those situations where the law is not sufficiently clear for a reasonable official to have known that his actions were illegal.Saucier v. Katz, 533 U.S. 194, 202 (2001); Phelan v. Village of Lyons, 531 F.3d 484 (7th Cir. 2008).

When examining a qualified immunity defense, a court examines whether a constitutional right has been violated; and whether that right was sufficiently well established that a reasonable officer would have been aware of it. Saucier v. Katz, 533 U.S. 194, 200 (2001). It is no longer necessary to address the two portions of the qualified immunity analysis in any specific order; the discussion should be framed in the way that produces the clearest decision. Pearson v. Callahan, - U.S. -, 129 S. Ct. 808, 821 (2009); Narducci v. Moore, 572 F.3d 313, 318 (7th Cir. 2009).

Although qualified immunity is a defense, once it has been raised, the plaintiff carries the burden of defeating it. Mannoia v. Farrow, 476 F.3d 453, 457 (7th Cir.,2007); Jewett v. Anders, 521 F.3d 818, 823 (7th Cir.2008).

*EXCESSIVE FORCE CLAIM*

"The touchstone of Fourth Amendment inquiry is reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." <u>Green v. Butler</u>, 420 F.3d 689, 694 (7th Cir. 2005). See also, <u>Graham v. Connor</u>, 490 U.S. 386, 399 (1989)(Fourth Amendment inquiry is one of "objective reasonableness under the circumstances."). To determine if force used in a particular situation was reasonable, the court is to balance the nature and quality of the intrusion on the individual's rights against the countervailing governmental interests at stake. <u>Graham</u>, 490 U.S. at 395. As the Seventh Circuit has most phrased it, the inquiry "looks to whether the force used ... was excessive in relation to the danger he posed - to the community or to the arresting officers - if left unattended. <u>Estate of Escobedo v. Bender</u>, 600 F.3d 770, 780 (7th Cir. 2010), quoting <u>McDonald v. Haskins</u>, 966 F.2d 292, 292-93 (7th Cir. 1992); see also <u>Estate of Starks v. Enyart</u>, 5 F.3d 230 234 (7th Cir. 1993)(amount of force constitutionally permitted decreases with the threat of danger posed by the individual being seized).

Various cases have identified a number of factors relevant to the totality of the circumstances analysis. Those factors include the severity of any crime involved, whether the person poses an immediate threat to the safety of officers or others, and whether he is resisting arrest or attempting to evade arrest by flight. <u>Graham</u>, 490 U.S. at 397, citing <u>Tennessee v. Garner</u>, 471 U.S. 1, 7-8 (1985). See also, <u>Escobedo.</u> 600 F.3d at 780.

The initial questions posed by the parties are whether the use of any force at all was reasonable under the circumstances, and, if so, whether use of pepper balls was a reasonable choice of force. While ultimately I conclude that these are not dispositive issues, I begin with a discussion of these questions.

The first question, and the one that Plaintiffs emphasize, is whether any use of force at all was called for under the circumstances. Backes was suspected of no crime[3]; he had no criminal history or history of violence. See, <u>Jacobs v. City of Chicago</u>, 215 F.3d 758 (7th Cir. 2000)(use of force not indicated where person has not committed or is not about to commit a crime). He was not fleeing or making any type of aggressive move or using confrontational language; in fact, he was not doing anything at all other than sitting in his own car. He was reportedly suicidal, not homicidal. Given the report that he may have taken medications, Backes' failure to respond to voice commands need not necessarily have been viewed with apprehension. The circumstances did not present the need for "split-second judgments" that officers must sometimes make in "tense, uncertain, and rapidly evolving" situations. <u>Graham</u>, 490 U.S. at 396-97). In the several hours that the officers and then the CIERT team had been on the scene, nothing had changed.

On the other hand, there was a fear that Backes was armed. The record before the Court does not reveal exactly when it was learned that Backes did not have one of his personal weapons and who, if anyone, on the scene actually received that information. In addition, the computerized

---

[3]There is some suggestion by defendants that Backes' parking in the park violated a Village ordinance. Such a violation would hardly justify the use of force. See, <u>Bryan v. MacPherson</u>, 608 F.3d 614, 626 (7th Cir. 2010)(traffic infraction and argument with police not justify use of taser). The suggestion has not been considered by the Court.

reports, along with Backes' employment and background, suggested the possibility that he had access to (and therefore may have possessed) a weapon other than one of the two he ordinarily kept at home. A certain level of concern about whether Backes was armed might be seen as justified. Adding to that concern was the fact that Backes' car was parked in an area that would be heavily traveled during the upcoming weekday morning traffic and in an area where employees would soon be coming and going. Concern for the safety of those in the area may also have been warranted.

What inference might be drawn from these facts simply cannot be determined as a matter of law. For the Court to enter judgment on this basis would certainly be erroneous.

The second question is whether the choice of pepper balls a reasonable choice, assuming that some level of force was justified. While the parties before this Court have not fully explained what "pepper balls" are, other courts have provided some information. One court defined "pepper balls" as "rifle-fired projectiles that break into pieces upon impact and release oleoresin capsicum powder (commonly known as mace), thereby causing both pain at the point of impact and irritation of the targeted individual's eyes and breathing passages." Buck v. City of Albuquerque, 549 F.3d 1269 (10th Cir. 2008), quoting Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008)(also categorizing pepper balls as a specie of "less lethal" munitions). Another court noted that welts were observed where the pepper balls hit the arrestee's body. Ellis v. Devig, - F. Supp. 2d -, 2009 WL 1886644, June 26, 2009 (D. N.D.). In Beverly v. Casey, - F. Supp. 2d -, 2007 WL 433347, 3, Feb. 7, 2007 (D. Neb.), the court noted that pepper balls are a "non-lethal force designed to cause pain on impact and temporary incapacitation, without any permanent injury," id. at 3, and that they are "fired with compressed air, striking with eight to ten foot pounds of kinetic energy, and releasing oleoresin capsicum powder on impact." Id. n.3.

There are no cases cited to or located by the Court in the Seventh Circuit that analyze the use of pepper balls in the context of the Fourth Amendment. There are several from other Courts. In Buck, 549 F.3d 1269, the Tenth Circuit upheld the District Court's finding of unreasonable force from the repeated shooting of pepper balls at the plaintiff during a political protest while she was lying in the street. In Beverly, 2007 WL 433347 at 3, the court found it pertinent to its analysis that the officers had used lesser force, namely pepper spray, before they resorted to pepper balls, concluding that it was reasonable for the officers to have concluded that some level of force greater than pepper spray alone was necessary to effect the arrest.

While case law in this Circuit about pepper balls is lacking, the Seventh Circuit has several times extensively analyzed the use of tear gas. In Escobedo, the Seventh Circuit discussed that precedent, citing Stringer v. Rowe, 616 F.2d 993 (7th Cir. 1980) and Lock v. Jenkins, 641 F.2d 488 (7th Cir. 1981). The Court of Appeals summarized the constitutional limits on the use of tear gas as follows. First, use of tear gas in a confined area is appropriate "only in rare circumstances and was not justified when [plaintiff] did not constitute an actual threat." Id. at 781-2, citing Lock, 641 F.2d at 496. Second, its use should be "strictly limited to circumstances presenting the utmost degree of danger and loss of control," 782, quoting Stringer, 616 F.2d at 999. Finally, use of tear gas "to subdue individual[s], ... rather than to quell large disturbances, should be more restricted." Id..

Other Circuits' decisions that were cited with approval by the Escobedo Court are: Estate of Smith v. Marasco, 318 F.3d 497 (3d Cir. 2003)(use of tear gas and flash bang grenades against mentally unstable individual with no history of violence created question of fact whether force was excessive); Vinyard v. Wilson, 311 F.3d 1340, 1349 (11th Cir.2002) (officer used excessive force under Graham where he pepper sprayed a handcuffed and confined detainee); Greene v. Barber, 310

F.3d 889, 898 (6th Cir.2002) (officers' conduct might be found to be excessive force where officer used pepper spray on individual who was arrested for non-severe crime and who was not threatening anyone's safety or attempting to evade arrest by flight even though individual may have been actively resisting arrest and refused to be handcuffed); Slakan v. Porter, 737 F.2d 368, 372 (4th Cir.1984) (prison guard's use of tear gas "unquestionably crossed the line separating necessary force from brutality" where prisoner was locked in his cell and posed no direct physical threat to other inmates or any of the guards); Adams v. Metiva, 31 F.3d 375, 387 (6th Cir.1994) (a reasonable officer would know that spraying mace on a potentially blinded, incapacitated individual would violate the right to be free from excessive force).

The Escobedo Court concluded that, based on its controlling precedent and the clear trend in the law from other Circuits, it was clearly established as of July 19, 2005 that use of tear gas is unreasonable when:

> (1) attempting to subdue individuals as opposed to mass crowds;
> (2) when the individual does not pose an actual threat;
> (3) when the individual is not holding hostages;
> (4) when the individual has not committed a crime and the officers are not in the process of attempting to make an arrest;
> (5) when the individual is armed but merely suicidal as opposed to homicidal;
> (6) when the individual is not attempting to evade arrest or flee from the police; and
> (7) when the individual is incapacitated in some form.

Escobedo, 600 F.3d at 783.

While pepper balls are not tear gas, Escobedo's discussion can inform consideration of whether use of pepper balls was an appropriate first choice of force. On the one hand, there is no evidence suggesting that Backes was an *immediate* threat to the safety of the officers or others. He had neither demonstrated aggression nor made any type of threatening movement. He had said nothing at all. He had no history of violence and there was no indication that he was homicidal as

opposed to suicidal. No hostages were taken. Finally, it must be noted that Switzer and Sutton were aware of facts that might indicate Backes was incapacitated and hence unable rather than unwilling to comply with verbal orders.

On the other hand, concern about increasing traffic during the early morning work day increased as the time grew later. Concerns about employees who would be arriving to work at the medical facility nearby also entered into the decision making process.

There was also the concern that Backes might be armed. In a different legal context, the Supreme Court has acknowledged the danger to police officers of persons in vehicles. See, Penn. v. Mimms, 434 U.S. 106, 110 (1977). Michigan v. Long, 463 U.S. 1032 (1983). Officer Switzer initiated the proper inquiry: were Backes' known personal weapons still accounted for at his home. Unfortunately, the follow up to that inquiry was apparently incomplete. Whether the information that both weapons were accounted for was ever conveyed to the scene is not in the evidence before the Court, but it appears that the information would have been available to anyone who asked.

None of the cases discussed above or cited by the parties is precisely on point. As noted, there is no case law in the Seventh Circuit regarding the use of pepper balls, and case law regarding the use of tear gas, while informative, is not dispositive[4]. Clearly pepper balls are not lethal force. Other courts have found them to be less forceful than tear gas (the effects appear less severe and

---

[4]Plaintiff asserts that Escobedo found it clearly established in 1995 that the use of pepper spray violated the Fourth Amendment when used against an individual arrested for a "non-severe crime who was not actively threatening the police." This mis-states the facts of and the holding in Escobedo, which was concerned with an incapacitating concentration of tear gas, not with pepper spray. As noted above, the case is informative but not dispositive. Similarly, the use of pepper balls is not identical to the use of pepper spray, an error made by Defendants' argument that pepper spray use was reasonable as a matter of law.

shorter lasting) and more forceful than pepper spray (as opposed to spraying a person, the pepper balls actually strike the person hard enough to cause bruising). This uncertainty about whether the use of pepper balls was appropriate in the circumstances presented here is an uncertainty that would ordinarily preclude entry of summary judgment on this basis as well.

One additional factor, however, proves fatal to Plaintiffs' case, and that factor is the lack of personal involvement by these two Defendants in the exercise of force. A plaintiff only may bring a § 1983 claim against those individuals personally responsible for the constitutional deprivation. Doyle v. Camelot Care Centers, Inc., 305 F.3d 603, 614 (7th Cir. 2002). Supervisors may be liable under § 1983, but they too must have had some personal involvement in the constitutional deprivation, either by directing it or by consenting to the challenged conduct by their subordinates. Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th Cir. 2001), cited in Doyle, 305 F.3d at 614-5.


Plaintiff first asserts that Switzer is liable under the theory that one who creates the need for force is personally involved when the force is actually used. This theory arises in several cases from the Tenth Circuit, Allen v Muskogee, 119 F.3d 837 (10th Cir. 1997) and Sevier v. City of Lawrence, 60 F.3d 695 (10th Cir. 1995).

Sevier is not helpful. First, it is not factually analogous. It involved application of deadly force where the officer was "reckless or deliberate" in creating the need for force in the first place. Second, this theory has never been adopted in the Seventh Circuit, which continues to focus only on the question whether the actions were reasonable. Third, the theory has been criticized by at least one other Circuit Court. See, Whitlow v. City of Lousville, - F.3d -, Case No. 00-6557, 2002 WL 1455317 (6th Cir. 2002) (Sevier and Allen "overly broad"). Finally, Sevier notes that negligent acts

that precipitate a confrontation would not be actionable under § 1983.

Only in hindsight is it possible to say with certainty that Backes was unarmed and incapacitated. No deadly force was utilized here, and there is no reasonable way to conclude from the record before this Court that Switzer was either reckless or deliberate in any way that caused harm to Backes. It might be possible to make out an argument for negligence, but at no time did Switzer demonstrate any intent to harm Backes or any deliberate disregard for his safety.

Plaintiff next asserts that the actions of Switzer and Sutton actually constitutes the requisite personal involvement: Switzer participated in the pepper ball attack, and Sutton consented to it. I disagree that such "involvement" satisfies the requirements of § 1983.

Neither Officer Switzer nor Chief Sutton made the decision to utilize force, nor are they the ones who exercised the force that is challenged. Switzer made the decision to contact Sutton. As noted above, setting in motion a chain of events that culminates in force is not enough. The decision to report to one's supervisor and defer decision making to that supervisor too far removed from the exercise of force to be personal involvement in the ultimate use of force. Deferring decision making to one's supervisor is too indirect to be categorized as personal involvement.

Switzer himself also personally participated in the CIERT action, as a member of the CIERT team. He did not, however, personally participate in the shooting of pepper balls. He served only in a back-up role, providing cover for other members of the team. He neither fired the pepper balls himself nor played any part in the tactical decision to do so. He had no authority to countermand the CIERT supervisor's decision. There is no evidence other than Plaintiff's speculation that Switzer "had a realistic opportunity to intervene to prevent the harm from occurring." Montano v. City of Chicago, 535 F.3d 558, 569 (7th Cir. 2008). I therefore conclude that. Switzer's involvement falls

far short of what is needed for § 1983 liability.

Sutton's only action was to call in CIERT. There was nothing improper or unreasonable about that action; as discussed above, there were facts from which he might reasonably have inferred that Backes posed a danger. It was personnel of CIERT who made the decision to utilize force and who planned, directed and executed that force. Sutton may have been able to state his opinions to CIERT personnel, but once CIERT arrived, Sutton relinquished decision making authority to the CIERT supervisor. The case cited by Plaintiff, <u>Smith v. Rowe</u>, 761 F.2d 360 (7th Cir. 1985) is inapposite. In that case, a verdict against the Director of IDOC was upheld, using principles of supervisory liability. The Director was the supervisor of the correctional officers who were responsible for the constitutional injury, and the Director had actual knowledge of their misconduct. In the case before this Court, Plaintiff opines that Sutton can be liable under those principles for the conduct of individuals who were *not* under his supervisory control. This is a crucial difference.

As was the case with Switzer, Plaintiff complains about Sutton's inaction, namely his failure to prevent the use of pepper balls. Sutton too lacked a realistic opportunity to prevent CIERT from utilizing pepper balls. Plaintiff's assertion that Sutton retained supervisory authority over CIERT personnel is not only without factual support in the record, it is contradicted by the record. Sutton was the Chief of Police for the Village of Peoria Heights. CIERT is a law enforcement entity under the aegis of the Peoria County Sheriff. He had no other personal involvement in the conduct that is alleged to have been unconstitutional, namely firing pepper balls at Backes.

Neither Switzer nor Sutton was personally involved in the use of force against Backes. The evidence might be interpreted differently were there different defendants in this case. But there are not; Switzer and Sutton are the only two defendants. Without their personal involvement, Plaintiffs'

Fourth Amendment claims fail as a matter of law.

The motion for summary judgment as to the Fourth Amendment excessive force claim is therefore <u>GRANTED</u>.

## STATE LAW CLAIMS

### *BATTERY*

Under Illinois law:

> A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual.

720 ILCS 5/12-3.

As noted above, neither Defendant made physical contact with Backes. Plaintiffs assert, however, that a person who requests, aids, or abets a battery are equally liable with the assailant even if not actually present. For that proposition, Plaintiffs rely on <u>Christensen v. Frankland</u>, 58 N.E.2d 289 (Ill.App.1944), a case in which the sheriff's deputies who were executing an eviction of a tenant, injured the Plaintiff. Because the deputies were liable, the person responsible for the forcible detainer action (which was found unlawful) against the tenant was also liable. Considering that this proposition of law has never been applied again by any Court in the State of Illinois in the intervening 66 years, and considering that the facts of <u>Christensen</u> are not even close to analogous to the ones presented here, I decline to apply that holding.

As noted above, the two individual defendants were not personally involved in or responsible for the application of force to David Backes. Any physical injury he sustained was not therefore attributable to them.

Moreover, under the Illinois Local Government and Governmental Employees Immunity

Act, a police officer is not liable for acts or omissions in the enforcement of the law "unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. "Willful and wanton conduct" is defined in the Act as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others..." 745 ILCS 10/1-210.

In no way does the conduct of either Switzer or Sutton rise to the level of wilful and wanton conduct. Neither of them used force or directed the use of force. While it might be argued that they made errors in drawing conclusions from the facts before them, any such errors demonstrated neither an intent to cause harm or an utter indifference to Backes' safety in relaying their observations and conclusions to CIERT. They are both immune from liability for battery.

## *FALSE ARREST*

A false arrest or false imprisonment is an unreasonable restraint of an individual's liberty, against his will, caused or procured by the defendant. Meerbrey v. Marshall Field & Co., 564 N.E.2d 1222, 1231 (Ill.1990). It occurs when a person is "restrained or arrested by the defendant" and when the defendant "acted without having reasonable grounds to believe that an offense was committed by the plaintiff." Id.

Once again, the personal involvement of the Defendants is lacking. They neither restrained nor arrested Backes. They did not "procure" his arrest or restraint by notifying CIERT, because they did not make the decisions that followed CIERT's arrival on the scene.

Moreover, as stated above, they are entitled to immunity under the Tort Immunity Act, because in contacting CIERT, they were involved in law enforcement activity without any indication whatsoever of willful or wanton conduct.

*WILLFUL AND WANTON*

As noted above, the statute defines "willful and wanton" in such a manner as to make it inapplicable to the conduct of Switzer and Sutton. To the extent that there is a cognizable tort for willful and wanton misconduct, it fails for that reason, as well as for the immunity under the Tort Immunity Act.

*LIABILITY OF VILLAGE OF PEORIA HEIGHTS*

The Tort Immunity Act provides that "A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Because neither Switzer nor Sutton are liable, neither is the Village of Peoria Heights.

**CONCLUSION**

Kevin Hale's Motion for Summary Judgment (#30) is GRANTED. The motion by the Village, Sutton and Switzer (#28) is granted in its entirety. The Clerk is directed to enter judgment in favor of each of the Defendants and against the Plaintiff. All deadlines and hearing dates are vacated.

ENTERED ON October 28, 2010

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE